# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARLENA WORDLOW, as mother
and next friend of M.M., a minor,

      Plaintiff,

      v.

CHICAGO BOARD OF EDUCATION,
and Chicago Public School Security
Guard DIVELLE YARBROUGH,

      Defendants.

Case No. 16-cv-8040

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises out of Chicago Public School Security Guard Divelle Yarbrough's decision to handcuff compliant, six-year-old special education student M.M., because she allegedly took candy from a teacher, purportedly to teach the child a lesson—a decision made by Yarbrough without parental consent and despite the fact that the child presented no risk of flight or harm to herself or others. Plaintiff Marlena Woodrow, as mother and next friend of minor M.M., has brought suit against the Chicago Board of Education (the Board) and Yarbrough based upon this event. [33].

Plaintiff's claims against Yarbrough include: (1) excessive force in violation of 42 U.S.C. § 1983 (Count I); unlawful search and seizure in violation of 42 U.S.C. § 1983 (Count II); false imprisonment (Count IV); and intentional infliction of emotional distress (Count V). [33] ¶¶ 42–50, 59–66. Plaintiff's claims against the

1

Board include: (1) a *Monell* claim in violation of 42 U.S.C. § 1983 (Count III); (2) a *respondeat superior* claim (Count VI); and (3) indemnification (Count VII). [33] ¶¶ 51−58, 67−74.

The following motions are before this Court: (1) Yarbrough's motion for summary judgment [87]; (2) the Board's motion for summary judgment [89]; (3) Plaintiff's cross-motion for partial summary judgment against Yarbrough and the Board [94]; and (4) Plaintiff's motion for discovery-related sanctions against the Board under Federal Rule of Civil Procedure 37 [114].

For the reasons explained below, this Court grants in part and denies in part Yarbrough's motion for summary judgment [87]; denies the Board's motion for summary judgment [89]; grants in part and denies in part Plaintiff's cross-motion for partial summary judgment against Yarbrough and the Board [94]; and denies Plaintiff's motion for discovery-related sanctions against the Board [114].

## I.    Background

### A.    Local Rule 56.1 Statements & Evidentiary Issues

The following facts come from: (1) Yarbrough's Local Rule 56.1 statement of material facts [87-2] and Plaintiff's statement of additional facts [106]; (2) the Board's Local Rule 56.1 statement of material facts [91] and Plaintiff's statement of additional facts [112]; (3) Plaintiff's Local Rule 56.1 statement of material facts [99]; and (4) both the Board and Yarbrough's statements of additional facts [103], [109-2].

Plaintiff objects to many of Yarbrough and the Board's facts as "immaterial" to their motions for summary judgment. *See, e.g.*, [105] ¶¶ 3, 11, 14, 15, 16, 17, 27; [111]

¶¶ 9, 15, 30, 40, 48.  She also objects to many of the Board's facts as "clumps" of numerous facts within one statement.  *See, e.g.*, [111] ¶¶ 62, 70, 77.

The Board also objects to Plaintiff's facts to the extent they are based upon the exhibit labeled "CPSBOE Untrained Security Officer Spreadsheet" (Officer Spreadsheet).  [153].[1]  Specifically, the Board argues that this Court should disregard Plaintiff's reliance on this spreadsheet because she "fails to lay a proper foundation as to its authenticity," and thus "the factual conclusions she draws from [it] about CPS security officer training and monitoring are pure conjecture."  [101] at 2.  This Court will first address Plaintiff's Rule 56.1 objections before turning to the Board's evidentiary objection.

### 1.    Plaintiff's Rule 56.1 Objections

This Court has broad discretion to enforce the local rules governing summary judgment.  *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Benuzzi v. Bd. of Educ. of Chi.*, 647 F.3d 652, 655 (7th Cir. 2011).  Under the local rules, a party's statements of fact must contain "material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law."  L.R. 56.1(a)(1)(3).  Plaintiff argues that many of Yarbrough and the Board's statements should be struck as "immaterial" because not all of them are explicitly cited in their memoranda supporting summary judgment. *See, e.g.*, [105] ¶¶ 14, 15; [111] ¶¶ 40, 48.  This Court disagrees.

---

[1] Plaintiff first uploaded this exhibit as docket number [113-3].  Due to an uploading error, Plaintiff has since filed a corrected version as docket number [153]; the Board has acknowledged that this is a corrected version of the exhibit, [154] at 1.

For example, Plaintiff argues that this Court should strike Yarbrough's statement that he was a security officer at Fernwood School because it is not cited in the brief. [105] ¶ 3. But both of Plaintiff's Section 1983 claims rely upon Yarbrough acting as a state actor through his CPS security officer position, and Yarbrough's summary judgment motion is entirely premised upon the law as it applies to school security officers. [33]; [87-1]. Plaintiff's other "immateriality" objections follow a similar frivolous course; she even seeks to strike statements that she offers and relies upon as undisputed facts in her own L.R. 56.1 statement of material facts. *See, e.g.*, [111] ¶ 14 (seeking to strike Yarbrough's statement that the Board terminated him, although Plaintiff introduces this fact in [99] ¶ 75); [111] ¶ 15 (seeking to strike the Board's statement that Jadine Chou was the Chief of Safety and Security even though the Board explicitly mentions Chou in its memorandum supporting summary judgment, [90] at 10). This Court thus overrules Plaintiff's immateriality objections; but this Court does not go so far as to disregard Plaintiff's L.R. 56.1(b)(3) responses, as both defendants suggest. [122] at 1; [128] at 4.

Plaintiff also argues that this Court should strike many of the Board's statements for containing "clumps" of numerous facts within one statement. *See, e.g.*, [111] ¶¶ 62, 70, 77. But Local Rule 56.1(a) requires only that the Board's Rule 56.1 statement "consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." This Court

finds that Progress Rail has satisfied this requirement, and thus overrules Plaintiff's objections.

### 2. The Board's Authentication Objection

Regarding the Board's authentication objection to the Officer Spreadsheet, [153], Fed. R. Civ. P. 56(c)(2) permits a party to object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *See Rao v. Gondi*, No. 14 C 66, 2017 WL 2445131, at *3 (N.D. Ill. 2017). It is well-established that the proponent of evidence must lay a proper foundation as to its admissibility. *See United States v. Christi*, 513 F.3d 762, 769–70 (7th Cir. 2008). This includes authenticity under Federal Rule of Evidence 901(a): "To satisfy the requirement of authenticating an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." To do so, Plaintiff may rely upon the testimony of a witness with knowledge that the item is what she claims. Fed. R. Evid. 901(b)(1). Moreover, the Seventh Circuit has held that a party's "very act of production [is] implicit authentication." *United States v. Brown*, 688 F.2s 1112, 1116 (7th Cir. 1982).

The Board argues that this Court should disregard Plaintiff's reliance on the Officer Spreadsheet because Plaintiff has "no evidence from anyone with personal knowledge to support her factual conclusions" about it. [101] at 2. Specifically, according to Plaintiff, the spreadsheet shows that the Board allowed 174 untrained CPS security officers "to work in CPS schools with children," [95] at 12. The Board

contends that at most, the spreadsheet indicates that "some individuals were not registered for training or had registered but did not attend." [101] at 3.

Plaintiff responds by explaining that during Deputy Chief Safety and Security Officer Bond's deposition, Bond informed Plaintiff of an audit that had been conducted following Yarbrough's actions to determine how many other untrained security officers were being employed by CPS at that time. [125] at 2. As soon as Bond testified that a Board document existed listing all untrained security officers employed by the Board, Plaintiff demanded the Board produce this document. [96-8] at 94; [125] at 2. Bond's description of the document is as follows:

> Q: [At] some point you created a list of all the people who had not been trained; right?
> A: No. I wouldn't have been the one creating that list.
> Q: Did you ever see that list?
> A: There would have been a list generated to get them scheduled into training classes. So, yes, there probably was at some point a list of officers that weren't trained.

[96-8] at 94. After two demands, counsel for the Board produced the document requested at Bond's deposition, which is now the Officer Spreadsheet. [125] at 2–3.

Based upon the record, this Court finds that the Officer Spreadsheet is clearly authenticated; Bond identified the exhibit in his oral testimony as a spreadsheet listing untrained officers, Plaintiff then requested the document, and the Board produced it. Moreover, the Board's act of production constituted implicit authentication. *See Brown*, 688 F.2d at 1116 ("Just as [Brown] could have identified the records by oral testimony, his very act of production was implicit authentication" under Rule 901).

6

Moreover, the Board's argument that Plaintiff falsely cites the exhibit is a matter of semantics. Even if the individuals on the list were simply not registered for training or had registered but did not attend, as the Board suggests, they were still untrained officers working in CPS schools, as Plaintiff notes in his LR 56.1 statement. [99] ¶ 45.

Therefore, this Court overrules the Board's authenticity objection as to the Officer Spreadsheet.

## B. The Parties

The Board oversees and operates Chicago public schools (CPS). [91] ¶ 2. The Board utilizes varying types of security guards in its schools, and the parties spend considerable time debating the differences among them. *Id.* ¶¶ 11, 36; [111] ¶ 11. But while the parties dispute these security guards' distinct titles, job parameters, and direct employers, [111] ¶ 11, they do not dispute that some security guards are off-duty Chicago Police Department (CPD) officers, while some security guards are unaffiliated with CPD. [91] ¶ 11. For clarity purposes, this Court will refer to non-CPD affiliated security guards as "security officers."

Divelle Yarbrough worked a security officer at Fernwood Elementary School (Fernwood) from September 21, 2015 until his termination on March 21, 2016. [87-2] ¶¶ 3, 14. He was 46-years-old on March 18, 2016. [99] ¶ 5. Fernwood has one security officer and one security supervisor. [91] ¶ 38. At the time of Yarbrough's hire, the Board knew that this was his first job working with students in a school

setting; prior to working at Fernwood, Yarbrough was a bouncer at the Red Diamond Strip Club. *Id.* ¶¶ 63−64.

During the 2015-16 school year, M.M. was a six-year-old, first grade student at Fernwood. [87-2] ¶ 6. At that time, she weighed 67 pounds and was three-feet, six inches tall. [99] ¶ 1. M.M. was a special education student at Fernwood; her homeroom teacher was Heather Minyard and her special education teacher was Corey Brewer. [87-2] ¶ 6.

### C.    The Board's Training Policies & Practices

#### 1.    General Security Officer Training Requirements

The Board prohibits security guards from working in a Chicago public school without "being properly trained." [99] ¶ 28. Prior to March 18, 2016, proper training included successfully completing "CPS Training" and receiving a passing score on the CPS security skills assessment. *Id.* ¶ 25.

CPS security training focuses on "soft skills" and "technical skills." [91] ¶ 21. Technical skills involve checking that doors are locked or looking for suspicious items, while soft skills involve de-escalation techniques such as posture and non-verbal communication. *Id.* To teach these "soft skills," CPS has offered training through the Crisis Prevention Institute (CPI) and QBS.[2] *Id.* ¶¶ 18, 20. CPS' Safety and Security Chief and Deputy Chief—Jadine Chou and Brian Bond, respectively—began implementing CPI shortly after they joined the Safety and Security department in

---

[2] While "QBS" may refer to Quality Behavior Solutions (a safety training service), the parties do not actually define the term "QBS" in the record.

2012. *Id.* ¶¶ 14–15, 18. CPI trained officers on using restraint techniques once a student was already under an officer's control. *Id.* ¶ 20. Chou and Bond then switched to the QBS program in 2016, as it offered better training on how to insert oneself "into an active situation." *Id.*

Off-duty CPD officers working as security guards are not required to complete CPS training, based upon the theory that they are already trained on "just about everything [CPS] would train . . . [its] security officers." *Id.* ¶ 27. But according to Rodney Jones, a CPD officer and head of security at Fernwood, he received no training as a CPD officer about permissible restraint techniques on students, nor did he receive training as a CPD officer about CPS practices and policies. *Id.* ¶¶ 39, 40. He did, however, receive training as a CPD officer about Illinois law on restraining children. *Id.* ¶ 40.

### 2. CPS Physical Restraint Training & Handcuff Policy

Security officer training involves teaching officers how to physically restrain students. *Id.* ¶ 22. This training teaches officers that momentary physical interventions require short term physical contact. *Id.* Bond, as Deputy Chief of Safety and Security, is responsible for preparing and delivering CPS security training. *Id.* ¶ 14. His description of the Board's physical restraint training is as follows:

> What we use as far as physical restraint is a – it's a technique taught by QBS. It involves engaging from the side, typically at either the shoulder or the elbow, and it begins with – they call it a shoulder check, and, and it's literally just an I'm here, like there's someone physically next to you. So that's the start of the engagement. From there there is a one-person restraint, two-person restraint, depending on how many people you have

9

to help.  We generally – depending on the situation, if a security officer has backup, if they have someone that can work with them, two people will always be able to restrain an individual more safely than one.  Because part of our restraint model is making sure that in restraining a student, you're not also harming the student. . . . the hold we have is designed to prevent restraint-related asphyxiation.  Because that's one of the warnings.  You know, you put a child on their stomach on the ground and that child suffers from asthma or has some type of issue like that -- . . . So we teach restraining that involves arms and, you know, limbs going below the chest cavity so we're not getting anywhere near putting pressure on the lungs, things like that.

*Id.* ¶ 23; [93-3] at 116−17.

Security officers are not permitted to use physical restraints as a form of punishment or as a teaching moment.  [91] ¶ 24.  And CPS does not allow security officers to carry or use handcuffs in schools, although the Board admits that this is not a written policy.  [99] ¶ 29.

### 3.    **CPS' Security Officer Onboarding System**

CPS' security officer onboarding and training system suffered from what Bond admits was a "notification lacuna." [91] ¶ 34.  CPS school principals hire security officers, who then report to the schools in which they work.  *Id.* ¶ 32.  But at the time of Yarbrough's hiring, the Board had no policy in place to automatically notify it when security officers were hired so that Safety and Security could schedule the new officers' mandatory trainings.  [99] ¶ 41.  In short, the onus was on principals to notify Safety and Security of new hires who needed training.  [91] ¶¶ 32−34.

Therefore, when Fernwood Principal Robert Towner hired Yarbrough in September 2015, it was his responsibility to reach out to Safety and Security to inform them of the new hire and get Yarbrough training for his new position.  [99] ¶ 39.  And

10

after hiring Yarbrough, Principal Towner knew that the Board's start-up training had passed for security officers. *Id.* ¶ 51.[3] But Principal Towner never contacted anyone at CPS to see if they could train Yarbrough, as it did not "dawn on him" that Yarbrough needed training prior to working at the school with children. *Id.* ¶ 52. As a result, Yarbrough received no CPS security training before starting his job at Fernwood. *Id.* ¶ 54.

Bond testified that, in his estimate, less than 100 officers—or less than ten percent of CPS officers—were untrained in 2016. [91] ¶ 37; [93-9] at 93. Plaintiff's Officer Spreadsheet [153] lists 174 officers who had not allegedly not received training, although she does not clarify the spreadsheet's specific time frame. [99] ¶ 45.

## D.  Disciplinary Practices at Fernwood

The parties dispute whether Principal Towner and Jones condoned Yarbough's disciplinary action and handcuff use. Both Towner and Jones testified that security guards were not responsible for disciplining students at Fernwood, [91] ¶ 44, but Yarbrough testified that both Towner and Jones told him to come up with disciplinary plans for students, [93-2] at 15–16, and carry handcuffs every day, *id.* at 74. Jones also testified that Yarbrough discussed using handcuffs with him twice prior to the incident with M.M. and that Jones told Yarbrough such behavior was not permitted.

---

[3] At the time of Yarbrough's hire, the Board offered start-up training sessions in the beginning of the school year, along with subsequent training sessions each month. [99] ¶ 27.

[91] ¶ 46.  Yarbrough maintains that no one told him handcuffs were not permitted. [93-2] at 37; [111] ¶ 46.

### E. The Handcuffing Incident

During the school day on March 18, 2016—before the incident with M.M.—Yarbrough handcuffed another first-grade student, N.H.  [99] ¶ 7.  Shortly after Yarbrough removed his handcuffs from N.H., Brewer arrived at Minyard's classroom door with M.M.  *Id.* ¶ 8.  Brewer informed Yarbrough that M.M. had taken candy from a teacher and had thrown up on herself.  *Id.* ¶ 10.  Yarbrough saw vomit on M.M. and knew that Brewer dealt with special needs students such as M.M.  *Id.* ¶¶ 9, 10.  At this time, Yarbrough handcuffed M.M. in both Minyard and Brewer's presence.  *Id.* ¶ 12.  According to Yarbrough, he did so as "kind of an isolated time out" and as a "teaching moment." *Id.* ¶¶ 13, 22; [87-2] ¶ 19.

After handcuffing M.M., Yarbrough brought her down a staircase to his security desk, where he directed M.M. to sit.  [99] ¶ 17−18;[4] [93-2] at 108.  The parties spend considerable time debating where M.M. sat in relation to the staircase, but by all accounts, Yarbrough sat her approximately two or three feet away from under the staircase.  *See, e.g.*, [102] ¶ 18; [93-2] at 121.  The parties and their witnesses also dispute how long M.M. was in handcuffs; the estimated time period ranges from over three minutes, [87-2] ¶ 11, to no more than five minutes, [88-4] at 179, to between 15

---

[4] The Board disputes whether Yarbrough's testimony indicates that he "directed" M.M. down the stairs. This Court finds the relevant testimony supports Plaintiff's assertion that Yarbrough directed, or brought, M.M. down the stairs to his security desk: "Q: [T]he handcuffs were on her as you went the 15 feet down the hallway.  The handcuffs were on her going down the stairs.  The handcuffs are on her while she's sitting at your security desk?  [Yarbrough]: "Yes, sir." Q: Okay.  And while you're walking down the hallway and down the stairs, you're talking to [M.M.]?  [Yarbrough]: Yes, sir." [93-2] at 119.

and 20 minutes, [88-3] at 117. It is undisputed that the school called M.M.'s mother, and upon arriving and seeing M.M. in handcuffs, she demanded that Yarbrough remove them. [99] ¶ 20. Principal Towner terminated Yarbrough several days after he handcuffed M.M. *Id*. ¶ 75. M.M. has since been diagnosed with PTSD due to the incident. [106] ¶ 1. The parties dispute whether she will require additional professional therapy due to the incident. [120] ¶ 1.

### F.    Other CPS Handcuffing Incidents

The parties dispute how many other handcuffing incidents have occurred within CPS. The Board acknowledges that it has identified five other school handcuffing incidents, although the parties dispute whether the officers involved were off-duty CPD officers or security officers. *See* [111] ¶¶ 67−75. Plaintiff asserts that the Board is aware of at least six cases in which CPS security officers handcuffed students. [99] ¶¶ 69−74.

### III.    Summary Judgment Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must

construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

Cross-motions for summary judgment "do not waive the right to trial;" rather, this Court "treats the motions separately in determining whether judgment should be entered in accordance with Rule 56." *Marcatante v. City of Chicago, Ill.*, 657 F.3d 433, 438–39 (7th Cir. 2011).

## IV. Summary Judgment Analysis

### A. Plaintiff's Section 1983 Claims and Yarbrough's Qualified Immunity Defense

Plaintiff's Count I and II allege that Yarbrough used excessive force and engaged in an unlawful seizure[5] when he handcuffed M.M., in violation of the Fourth Amendment and 42 U.S.C. § 1983. [33]. Plaintiff's motion argues that Yarbrough's

---

[5] Count II asserts an "unlawful search and seizure" claim, but Plaintiff fails to allege that she was illegally searched in any way. [33] ¶¶ 47–50. Thus, this Court only considers her excessive force "seizure" claim.

use of handcuffs on M.M. was objectively excessive and unreasonable, entitling her to summary judgment on those claims. [94]. Yarbrough, on the other hand, argues that he is entitled to qualified immunity on both Counts I and II. [87-1] at 3–8. He also claims that there are "insufficient undisputed facts" to support a finding that M.M. was "seized" within the meaning of the Fourth Amendment. *Id.* at 8–11.[6] This Court will first address Plaintiff's Section 1983 claims before addressing whether Yarbrough is entitled to qualified immunity.

To succeed on a Section 1983 claim, a plaintiff must show that: "(1) the party against whom the claim is brought qualifies as a 'person acting under the color of state law'; and (2) the conduct alleged amounted to a deprivation of rights, privileges, or immunities under the Constitution or the laws of the United States." *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 397 (7th Cir. 2005) (internal citation omitted). Neither party disputes that Yarbrough, as a municipal employee, acted under color of state law during his encounter with M.M. Therefore, the only issue is whether Yarbrough violated M.M.'s Fourth Amendments when he handcuffed her at school.

---

[6] This Court focuses primarily on whether M.M.'s seizure was excessive and unreasonable, as Yarbrough undoubtedly "seized" her within the meaning of the Fourth Amendment. *Tom v. Voida*, 963 F.2d 952, 956–57 ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") (citing *United States v. Mendenhall*, 446 U.S.544, 554 (1980)). Based upon the undisputed portions of this factual record, handcuffing M.M. certainly constituted a seizure wherein she was not free to leave; Yarbrough's counsel admitted as much in open court when he conceded that handcuffs, at the very least, limited M.M.'s movement while she remained within Yarbrough's custody.

## 1. M.M.'s Excessive Force Claim

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" effectuated through excessive force. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Courts analyze excessive force claims under the Fourth Amendment's "reasonableness" standard. *Id*. at 395. The Supreme Court in *Graham* requires courts to use three factors for this reasonableness inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396. Moreover, these factors are not exclusive, and courts may identify other "objective circumstances potentially relevant to a determination of excessive force," *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015), such as the "suspect's age and the school context," *E.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018). Based upon the record, this Court finds that under the Fourth Amendment's reasonableness standard, Yarbrough's handcuffing constituted excessive force as a matter of law.

The undisputed facts demonstrate that at the time Yarbrough decided to handcuff M.M. without parental consent and bring a compliant 6-year old child to his security desk: (1) Yarbrough was a 46-year-old adult male, [99] ¶ 5; (2) M.M. weighed 67 pounds and was three-feet, six inches tall, *id*. ¶ 1; (3) M.M. had taken candy from a teacher, *id*. ¶ 10; (4) Yarbrough saw vomit on M.M. and knew she had thrown up on herself, *id*.; and (5) M.M. has since been diagnosed with PTSD due to the incident, [106] ¶ 1. Moreover, Yarbrough admits that at the time he handcuffed and brought

M.M. to his security desk, he was aware that a police officer "would not handcuff nor arrest a 6-year-old girl for stealing candy" and that someone is in "custody" when they are in handcuffs. *Id.* ¶¶ 14−15. Nonetheless, he handcuffed M.M. to create "kind of an isolated time out" and as a "teaching moment." *Id.* ¶¶ 13, 22; [87-2] ¶ 19.

Under *Graham's* factors, the severity of the crime in this instance—a six-year-old taking candy from a teacher—is minimal, at best. And there is no evidence that M.M. was uncooperative, posed any threat whatsoever, or resisted Yarbrough; rather, she was simply standing next to Brewer when Yarbrough handcuffed her. *See* [99] ¶ 12. Moreover, other courts considering school handcuffing cases have found factors such as age, size, and demeaner to factor heavily into an excessive force finding. *See, e.g.*, *Dolgos*, 884 F.3d at 180 (finding a school resource officer's decision to handcuff a ten-year-old student constituted excessive force because even though the girl committed a misdemeanor offense, she posed no threat given her size—4'4" and 95 pounds—and calm demeanor, and she did not resist arrest or attempt to flee); *C.B. v. City of Sonora*, 769 F.3d 1005, 1030 (9th Cir. 2014) (*en banc*) (holding that handcuffing a "a calm, compliant, but nonresponsive 11-year-old child," who weighed about eighty pounds and stood around 4'8" tall, constituted excessive force, as he did not pose a safety threat and was "surrounded by four or five adults at all times"); *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006) (finding that officers handcuffing of a nine-year-old girl in school for five minutes after she physically threatened her gym teacher constituted an unreasonable seizure and excessive force, in part because of her "young age and the fact that it was not done to

protect anyone's safety"); *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) (holding that an officer used excessive force against ten-year-old girl under *Graham* analysis). Notably, these cases—all of which reviewed either summary judgment decisions or judgments as a matter of law—involved older and larger children who engaged in more serious offenses, or behavior, than M.M.

Yarbrough handcuffed a six-year-old student who committed no crime, posed no threat, and did not resist in any way. Thus, this Court finds as a matter of law that Yarbrough's handcuffing constituted excessive force in violation of the Fourth Amendment.

### 2. M.M.'s Unlawful Seizure Claim

Plaintiff's excessive force claim and unlawful seizure claim go hand in hand. The Fourth Amendment prevents police from searching private areas without a warrant absent exigent circumstances and from seizing suspected criminals unreasonably. *Wallace ex rel. Wallace v. Batavia Sch. Dist.* 101, 68 F.3d 1010 (7th Cir. 1995) (citing *Ingraham v. Wright*, 430 U.S. 651, 673 n.42 (1977)). The Supreme Court has applied the Fourth Amendment's protection to searches of students by school administrators at public schools. *New Jersey v. T.L.O.*, 469 U.S. 325 (1985). And the Seventh Circuit has subsequently extended *T.L.O.* to seizures of students by school officials. *Wallace*, 68 F.3d at 1012–14. But because "public school students are in a unique constitutional position enjoying less than the full constitutional liberty protection afforded those persons not in school," the Seventh Circuit has also held that "in the context of a public school, a teacher or administrator who seizes a

student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent." *Wallace*, 68 F.3d at 1013, 1014 (7th Cir. 1995). Therefore, in seeking to maintain order and discipline, a teacher or administrator is "constrained to taking reasonable action to achieve those goals." *Id.* at 1014. And depending on the circumstances, reasonable action may include "the seizure of a student in the face of provocative or disruptive behavior." *Id.*

When considering what constitutes "reasonable action," the standard is an objective one. *Id.* at 1014–15 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). This objective standard "does not ask what the teacher's intentions were, and it does not ask if the particular student thought the conduct was out of bounds." *Id.* at 1015. Instead, "it asks, at bottom, whether under the circumstances presented and known the seizure was objectively unreasonable." *Id.* Under this standard, this Court finds Yarbrough's decision to handcuff M.M. objectively unreasonable.

Yarbrough argues that his seizure was reasonable because "[w]ere it not for the use of handcuffs, [his] decision to take M.M. to his desk at the front door of the school would not raise any eyebrows." [87-1] at 10. But the handcuffs are precisely what makes Yarbrough's seizure unreasonable. As discussed above in relation to Plaintiff's excessive force claim, Yarbrough had no security-related reason to handcuff M.M.—he knew he could not arrest her for taking candy from a teacher, [99] ¶ 4, she posed no physical threat given her small size, *id.* ¶ 1, and the record does not indicate that she exhibited aggressive or resistant behavior. And surely, taking from

19

a teacher is not sufficiently disruptive or provocative under the objective *Wallace* standard to justify handcuffing a six-year-old child (and Yarbrough admitted as much, albeit subjectively, when he stated that he handcuffed her solely to teach her a lesson). *Id.* ¶ 22.

But Yarbrough's desire to teach M.M. a lesson is not enough, by itself, to make his decision to handcuff her reasonable. *See Bostic*, 458 F.3d at 1307 (finding that an officer's decision to handcuff a compliant, nine-year-old girl "to punish her and teach her a lesson" was "an obvious violation" of her Fourth Amendment rights, because "[e]very reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable").

This Court finds that under *Wallace*, Yarbrough's decision to handcuff M.M. was objectively unreasonable. Thus, as a matter of law, Yarbrough's handcuffing constituted an unlawful seizure in violation of the Fourth Amendment.

### 3. Yarbrough's Qualified Immunity Claim

#### a. Qualified Immunity Standard

Qualified immunity protects government officials from liability for damages under Section 1983, to the extent that their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine the applicability of qualified immunity on summary judgment, a court must engage in a two-part analysis to determine whether: (1) the facts, viewed in the light most favorable to the non-movant, establish the violation of a constitutional right; and (2)

the constitutional right at issue was "clearly established" at the time of the official's allegedly illegitimate conduct. *Id.* at 232; *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003). Having already found that Yarbrough violated M.M.'s Fourth Amendment rights, this Court must now determine whether those rights were "clearly established" at the time of his conduct. For purposes of qualified immunity, this Court considers Plaintiff's excessive force and unreasonable seizure claims together.

"Clearly established" means that existing precedent "placed the statutory or constitutional question beyond debate" at the time of the alleged violation, or the facts otherwise present the "rare obvious case" where a body of relevant precedent is unnecessary. *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). In other words, Plaintiffs must show that "every reasonable official would understand" that his actions violated a given right. *Id.* When deciding whether a right is "clearly established," the Seventh Circuit looks "first to controlling precedent on the issue from the Supreme Court and from [the Seventh] [C]ircuit." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012) (citing *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010)). If there is no such precedent, it looks "to all relevant case law to determine 'whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (citing *Estate of Escobedo*, 600 F.3d at 781).

In undertaking this analysis, the Seventh Circuit looks "at the right violated in a particularized sense, rather than at a high level of generality." *Id.* (citing *Roe v.*

*Elyea*, 631 F.3d 843, 858 (7th Cir. 2011)).  Such specificity becomes "especially important in the Fourth Amendment context," where the Supreme Court has recognized that an officer might struggle to determine how the "relevant legal doctrine" will apply to the "factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  But, "a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'"  *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).  In such a case, the Supreme Court has held that "a general constitutional rule already identified in the decisional law may apply with *obvious clarity* to the specific conduct in question, even though the very action in question has not previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (internal citations omitted) (emphasis added).  Thus, this Court must ask whether the state of the law in March 2016 gave Yarbrough "fair warning" that his treatment of M.M. was unconstitutional, *Pelzer*, 536 U.S. at 741, or whether the facts otherwise present the "rare obvious case" where a body of relevant precedent is unnecessary.  *Green*, 868 F.3d at 633.

### b. Qualified Immunity Analysis

Under *Phillips*, this Court looks first to controlling precedent on this issue from the Supreme Court and the Seventh Circuit.  678 F.3d at 513.  In March 2016, the law was clearly established that, at a minimum, seizures in response to school-related incidents had to be reasonable in light of the circumstances, and not excessively

intrusive. *See T.L.O.*, 469 U.S. at 341–42; *Wallace*, 68 F.3d at 1014. And the law was "clearly established that, as a general matter, police use of force must be carefully calibrated to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and the risk of flight." *See City of Sonora*, 769 F.3d at 1030 (citing *Graham*, 490 U.S. at 396)). But Plaintiff admittedly cannot identify an on-point Supreme Court or Seventh Circuit case addressing the Fourth Amendment implications of handcuffing a compliant, 6-year old special-needs child (without parental consent) for allegedly stealing a piece of candy, where such student presented no risk of flight or harm to herself or others.

Given the facts, however, Plaintiff need not identify a specific case. The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. As such, the doctrine shields an officer from suit when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he confronted; and thus, the officer remains protected from "the sometimes 'hazy border between excessive and acceptable force.'" *Saucier,* 533 U.S. at 206. Given the undisputed portions of the record, however, there is no hazy border in this case, and no reasonable officer would ever need a judge to tell them in advance that the conduct at issue here was unreasonable. *Green*, 868 F.3d at 633 (body of relevant precedent is unnecessary in the "rare obvious case").

In the alternative, this Court also turns to "all relevant case law to determine 'whether there was such a clear trend in the case law that [it] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Phillips*, 678 F.3d at 528 (citing *Estate of Escobedo*, 600 F.3d at 781).

The three circuit courts that have addressed the issue of handcuffing students under the Fourth Amendment remain split on whether school security personnel warrant qualified immunity. In *Sonora*, which involved a qualified immunity defense to a school-based excessive force claim, the Ninth Circuit found that "[i]t is beyond dispute that handcuffing a small, calm child who is surrounded by numerous adults, who complies with all of the officers' instructions, and who is, by an officer's own account, unlikely to flee, was completely unnecessary and excessively intrusive."[7] 769 F.3d at 1030–31. Thus, it held that the case fell into *Lanier's* "obvious clarity" category. *Id.* Notably, the plaintiff in *Sonora* was 11-years-old—five years older than M.M.—and the officers handcuffing the plaintiff had been told he was an "out of control juvenile" who was a "runner" and had "not taken his medication." *Id.* at 1011.

And in *Bostic*, the Eleventh Circuit similarly denied qualified immunity on both an excessive force and unreasonable seizure claim, finding that the officer's behavior was an "obvious violation" of the plaintiff's Fourth Amendment rights. 458

---

[7] The Ninth Circuit did, in *City of Sonora*, grant qualified immunity to the officers for the student's related unlawful seizure claim. 769 F.3d at 1033. *Sonora*, however, is distinguishable, as the plaintiff's unlawful seizure claim in *Sonora* involved the officers' decision to take him into temporary custody in a police vehicle, rather than the officers' decision to handcuff the plaintiff. *Id.* at 1027, 1034.

F.3d at 1307. Specifically, it held that the officer's "conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of Gray's Fourth Amendment's rights. . . . Every reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable." *Id.* And in *Bostic*, the plaintiff was nine-years-old—three years older than M.M.—and had threatened her gym teacher with violence. *Id.* at 1300.

In contrast to the Ninth and Eleventh Circuits, the Fourth Circuit found in *Dolgos* that although handcuffing a "calm, compliant ten-year-old who was surrounded by multiple adults in a closed room for hitting another child three days earlier" violated his Fourth Amendment rights, it could not "say that her seizure amounts to an 'obvious case' such that *Graham* put Dolgos on sufficient notice that her conduct was unlawful." 884 F.3d at 186.

Yarbrough, of course, argues in light of the Fourth Circuit's ruling that M.M.'s "right not to be handcuffed under the circumstances of the case was not clearly established at [the] time of her seizure." *Id.* at 187; [87-1] at 6. Plaintiff, on the other hand, argues, consistent with the Ninth and Eleventh Circuit's conclusions, that such an incident constitutes an "obvious violation," and also maintains that the Seventh Circuit's decision in *Wallace* put Yarbrough on notice that his behavior violated the Fourth Amendment. Specifically, she argues that "20 years before Yarbrough's actions in this case, the Seventh Circuit applied *T.L.O.* to schoolhouse seizures, holding that 'in the context of a public school, a teacher or administrator who seizes

25

a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent.'" [104] at 4 (citing *Wallace*, 68 F.3d at 1014).

Despite the Fourth Circuit's holding in *Dolgos*, a clear trend exists that recognition of the particular right here by a controlling precedent is "merely a question of time.'" *Phillips*, 678 F.3d at 528. Consistent with the precedent of both the Ninth and Eleventh Circuits, handcuffing a compliant six-year-old for taking candy—when she posed no risk whatsoever to Yarbrough, herself, or her classmates—constituted an obvious violation of M.M.'s Fourth Amendment rights. The Seventh Circuit's decision in *Wallace*, more than 20 years before Yarbrough handcuffed M.M., put Yarbrough on notice that seizures in response to school-related incidents must be reasonable and non-excessive. 68 F.3d at 1014. The Fourth Circuit in *Dolgos*, in contrast, relied only upon *Graham* in determining that the law was not clearly established. 884 F.3d at 186. And Yarbrough's decision to seize M.M. was obviously unreasonable and excessive; as discussed above, M.M. did not constitute any sort of security threat at the time Yarbrough handcuffed her. Moreover, she is both younger and smaller than the plaintiffs in *Sonora*, *Bostic*, and *Dolgos*. In short, every reasonable officer would have known that handcuffing a compliant six-year-old for purely punitive purposes is unreasonable and excessive under the facts of this case. *See Bostic*, 458 F.3d at 1307; *see also Wilson v. Cahokia School District #187*, No. 06-cv-0369-MJR, 2007 WL 1752150, at *3 (S.D. Ill. June 18, 2007) (denying qualified immunity to a school principal who "grabbed and shook" the eighth-grade

plaintiff and "threw her into a conference room" because it "is well-established that a principal or teacher cannot use excessive force, as here alleged, against a student."). Therefore, because Yarbrough had fair warning that handcuffing M.M. to teach her a lesson was an obvious violation of her Fourth Amendment rights, he is not entitled to qualified immunity.[8]

For the above reasons, this Court grants Plaintiff's motion for summary judgment as to Counts I and II [94] and denies Yarbrough's motion for summary judgment as to Counts I and II [87].

### B.    Plaintiff's State Law Claims Against Yarbrough

Plaintiff's remaining claims against Yarbrough include false imprisonment (Count IV); and intentional infliction of emotional distress (Count V).  [33] ¶¶ 59−63, 64−66.  In response to Count IV, Yarbrough argues that Plaintiff cannot sustain a false imprisonment claim due to the restrictive nature of a student's freedom of movement within a school.  [87-1] at 11.  In response to Count V, Yarbrough argues that his conduct was not sufficiently egregious to sustain a claim for intentional infliction of emotional distress.  *Id*. at 12.

### 1.    Yarbrough's False Imprisonment Claim

In Illinois, false imprisonment is an "unreasonable restraint of an individual's

---

[8] Yarbrough's motion for summary judgment includes a motion to strike and dismiss Plaintiff's claims for punitive damages as to her federal claims against Yarbrough.  [87-1] at 13.  A jury "may award punitive damages in a § 1983 case if it finds that the defendant's conduct was motivated by evil intent or callous indifference to the plaintiff's federally protected rights."  *Marshall v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002).  Given that Yarbrough admits he intended to teach M.M. a lesson, [99] ¶ 22, this Court finds that there is a genuine dispute as to whether Yarbrough acted with evil intent or callous indifference, or whether his actions arose from good (albeit misguided) intentions.  Therefore, it reserves the question of punitive damages as to Plaintiff's federal claims against Yarbrough for a jury.

liberty, against his will, caused or procured by the defendant." *Rogers v. Cook*, No. 08 C 2270, 2008 WL 5387642, at *3 (N.D. Ill. Dec. 23, 2008) (citing *Meerbrey v. Marshall Field and Co.*, 564 N.E.2d 1222, 1231 (1990)). Plaintiffs claiming false imprisonment must show that they were "restrained or arrested by Defendants and that Defendants acted without having reasonable grounds to believe that [they] committed an offense." *Id.* (citing *Wilson v. Cahokia Sch. Dist. #187*, No. Civ. 05-297-GPM, 2005 WL 2407577, at *2 (S.D. Ill. Sept. 29, 2005)).

Generally, students in Illinois "cannot show that they were unlawfully restrained in school because they do not possess freedom of movement within a school." *S.J. v. Perspectives Charter Sch.*, 685 F. Supp. 2d 847, 861 (N.D. Ill. 2010) (citing *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 654−55 (1995) (explaining that "unemancipated minors . . . are subject, even as to their physical freedom, to the control of their parents or guardians," such that when those children are in school, "the teachers and administrators of those schools stand in *loco parentis* over the children entrusted to them")); *see also Rogers*, 2008 WL 5387642, at *3 (dismissing a false imprisonment claim by a student as a matter of law because "Rogers 'could never show that [he] was unlawfully restrained because [he] never possessed freedom of movement within the school"); *Roger C. v. Valley View Pub. Sch. Dist. # 365-U*, No. 08 C 1254, 2008 WL 4866353, at *10−11 (N.D. Ill. June 23, 2008) (indicating that when allegations are based upon Illinois common law, as opposed to the Fourth Amendment, schools are exempt from common law tort liability).

Moreover, like M.M., the plaintiffs in both *Perspectives Charter School* and

*Rogers* brought separate Section 1983 claims relating to their alleged detention; the *Perspectives Charter School* court noted the following when dealing with the parallel false imprisonment and Section 1983 claims:

> Like *Rogers*, where the court noted that 'Rogers may have a cause of action' for excessive force and false arrest 'because he alleges that he was not merely detained . . . but was also placed in handcuffs,' S.J.'s § 1983 claims address the subsequent strip search that accompanied her detention. Because S.J. cannot state a claim for false imprisonment on the basis of her detention alone, the Court grants [defendants'] motion to dismiss Count IX.

685 F. Supp. 2d at 862 (citing *Rogers*, 2008 WL 5387642, at *3).

Plaintiff acknowledges that the above cases establish that she cannot, as a matter of law, make out a false imprisonment claim. [104] at 10. Thus, this Court grants Yarbrough's motion for summary judgment [87] as to Count IV.

### 2. Plaintiff's Intentional Infliction of Emotional Distress Claim

To establish an IIED claim under Illinois law, Plaintiff must introduce sufficient evidence that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress; and (3) the defendant's conduct did cause severe emotional distress. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006). Given the many material, disputed facts that remain between the parties as to Plaintiff's IIED claim, this Court denies Yarbrough's motions for summary judgment [87] as to Count V.

### a. Extreme and Outrageous Conduct

The standard for extreme and outrageous conduct is high. Extreme and

outrageous conduct "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001). Rather, extreme and outrageous conduct exists only where the conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bergstrom v. McSweeney*, 294 F. Supp. 2d 961, 969 (N.D. Ill. 2003). The Illinois Supreme Court has promulgated several non-exclusive factors that help inform this analysis. *See McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). First, "the degree of power or authority which a defendant has over a plaintiff" can impact whether that defendant's conduct is outrageous. *Honaker*, 256 F.3d at 490 (quoting *McGrath*, 533 N.E.2d at 809). The "more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous, particularly when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment." *Id*. at 491.

Another factor is whether the defendant "reasonably believed that his objective was legitimate." *Id*. Greater latitude is given to a defendant "pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff." *Id*. A final consideration is whether the plaintiff is "particularly susceptible to emotional distress because of some physical or mental condition or peculiarity." *Id*.

### b.  Intent to Inflict Severe Emotional Distress

The second prong of an IEED claim "can be established with proof of either intentional or reckless conduct." *Fielding v. Lavender*, No. 02-cv-0991, 2003 WL

742190, at *4 (N.D. Ill. Mar 3, 2003) (citing *Vance v. Chandler*, 597 N.E.2d 233, 237 (Ill. App. Ct. 1992)). "In other words, the tort applies "where the actor *desires* to inflict severe emotional distress," where "he *knows* that such distress is certain, or substantially certain, to result from his conduct," or where he acts recklessly "in *deliberate disregard* of a high degree of probability that the emotional distress will follow." Restatement (Second) of Torts § 46 cmt. i (1965) (emphasis added); *see also Honaker*, 256 F.3d at 494; *Vance*, 597 N.E.2d at 237.

### c.     Severe Emotional Distress

In Illinois, "emotional distress alone is not sufficient to give rise to a cause of action. The emotional distress must be severe." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1030 (7th Cir. 2006). Emotional distress includes "all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 84 (Ill. 2003) (citing Restatement (Second) of Torts § 46 cmt. j (1965)). It is "only where it is extreme," however, "that the liability arises." Restatement (Second) of Torts § 46 cmt. j (1965); *see also Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016).

Over time, Illinois courts "have delineated with some precision the type of emotional distress that is sufficiently severe to meet the law's requirements." *Honaker*, 256 F.3d at 496. Plaintiffs fail when they complain that a defendant's actions "caused them simply to become annoyed, frustrated, stressful, distressed, embarrassed, humiliated or nervous." *Id.* at 495. In contrast, Illinois courts "have

been more inclined to characterize the emotional distress as severe" when the distress has manifested itself "either through physical symptoms or has necessitated medical treatment." *Id*.

As a final point, the individual elements of an IIED claim are, to a certain degree, linked. That is, in many cases, "the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Id*. at 496 (quoting *Wall v. Pecaro*, 561 N.E.2d 1084, 1088 (Ill. App. Ct. 1990)). These cases acknowledge that, "even when significant evidence [is] not presented as to the severity of distress, the very nature of the conduct involved may be evidence of its impact on the victim." *Id*. As a result, Illinois courts have tended "to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress." *Id*. (quoting *Bristow v. Drake St. Inc.*, 41 F.3d 345, 350 (7th Cir. 1994)).

### d. Plaintiff's IIED Claim Relies Upon Disputed Facts

Here, the record contains too many disputed facts as to Plaintiff's IIED claim.

First, a jury could reasonably find Yarbrough's conduct "extreme and outrageous" given: (1) Yarbrough's position of power over M.M. as a security officer; and (2) the reasonableness, or lack thereof, inherent in his decision to handcuff M.M. Moreover, the following facts, all of which are relevant to the "intent" and "severe emotional distress" prongs, are disputed: whether Plaintiff was particularly susceptible to emotional distress by nature of being a special education student, [124]

¶ 14; how long M.M. was handcuffed, [87-2] ¶ 11; [88-3] at 117; [88-4] at 179; whether

M.M. showed signs of distress while handcuffed, [124] ¶ 16; whether Yarbrough knew

Plaintiff was likely to be distressed by his actions, and if so, whether he acted with

malice or intent, [99] ¶¶ 9, 10; [109-2] ¶ 14; the legitimacy of Plaintiff's PTSD

diagnosis, [120] ¶ 1; and whether she might need ongoing medical treatment, *id*.

These disputes preclude summary judgment on Plaintiff's IIED claim.[9]  Yarbrough's

motion for summary judgment as to Count V, [87], is therefore denied.[10]

### C.    Plaintiff's *Monell* Claim Against the Board

### 1.    *Monell* Standard

Both the Board, [90], and Plaintiff, [94], have moved for summary judgment on

Plaintiff's *Monell* claim.  A plaintiff cannot hold a municipality or local government

unit liable under Section 1983 unless the underlying constitutional deprivation is

caused by a municipal custom or practice.  *See Monell v. New York City Dept. of Soc.

Serv.*, 436 U.S. 658 (1978); *see also Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th

Cir. 1997) ("Municipalities and other local government units cannot be liable under §

1983 on a respondeat superior theory, but can be liable if action pursuant to an official

policy or custom of the municipality or government unit causes a constitutional

---

[9] Yarbrough's motion for summary judgment also includes a motion to strike and dismiss Plaintiff's claims for punitive damages as to the state law claims against Yarbrough.  [87-1] at 13.  The Illinois Supreme Court has held that "punitive damages cannot be sanctioned as an additional recovery" in an IIED claim, as the "rendition of compensatory damages will be sufficiently punitive." *Knierim v. Izzo*, 174 N.E. 2d 157, 165 (Ill. 1961).  Plaintiff agrees.  [104] at 13.  Thus, Plaintiff's claim for punitive damages remains only as to his Fourth Amendment claims against Yarbrough.

[10] Plaintiff also brings a *respondeat superior* claim against the Board for her state law claims.  [33] ¶¶ 67−69.  The Board has joined Yarbrough's motion for summary judgment, [90] at 15, on these claims.  Thus, only *respondeat superior* as to Plaintiff's IIED claim survives summary judgment.

tort.").

A local governmental unit's unconstitutional policy or custom can be shown by: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a "custom or usage" causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004)). The official policy, widespread custom, or action by an official with policy-making authority must be the "moving force" behind the plaintiff's constitutional injury. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (citing *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).

Here, Plaintiff proceeds under both the express policy and widespread practice methods, arguing that the Board is liable both for: (1) the failure of its official policy to have a mechanism to ensure that every security officer was trained; and (2) for its actual widespread practice of failing to train security officers." [33] ¶¶ 51−58; [110] at 3. In short, Plaintiff alleges that the Board had both an unlawful official policy and widespread custom that led to her Fourth Amendment violations. The Board argues that this claim fails because: (1) the Board does train CPS security officers and administrators; (2) Plaintiff cannot show a pattern of untrained CPS security officers handcuffing students or school principals failing to supervise; and (3) Plaintiff cannot show that Board policymakers were deliberately indifferent. [90] at 9.

This Court first turns to *Monell's* "express policy" prong. An "unconstitutional policy can include both implicit policies as well as a gap in expressed policies." *Daniel*

v. *Cook Cnty.*, 833 F.3d 728 (7th Cir. 2016). And *Monell* liability can be predicated on a failure-to-train or supervise claim. *Vukadinovich v. McCarthy*, 901 F.2d 1439, 1443 (7th Cir. 1990). Yet there are only "'limited circumstances' in which a 'failure to train' will be characterized as a municipal policy under Section 1983." *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) (quoting *Bd. of the Cnty. Of Comm'rs v. Brown*, 520 U.S. 397, 407 (1997)). Mere negligence by the municipality remains insufficient, and inadequate training may serve as a basis for Section 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of the person" with whom the officer comes into contact. *Robles*, 113 F.3d at 735 (7th Cir. 1997) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Mere.

Although the Seventh Circuit has described the "deliberate indifference" standard as somewhat "elusive," *Cornfield v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993), the Supreme Court in *City of Canton* observed that the standard is met where, "in light of the duties assigned to specific officer or employees[,] the need for more or different training is . . . obvious," and the existing inadequacy is "likely to result in the violation of constitutional rights." 489 U.S. at 390. A municipality can therefore demonstrate a deliberate indifference to the constitutional rights of its citizens in two ways: (1) when the municipality "fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation"; or (2) the municipality "fails to provide further training after learning of a

pattern of constitutional violations." *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003). Under either scenario, "the finding of 'deliberate indifference' is derived from the City's failure to act in the face of 'actual or constructive notice' that such a failure is likely to result in constitutional deprivations." *Robles*, 113 F.3d at 745 (citing *Cornfield*, 991 F.2d at 1327).

The "deliberate indifference" standard similarly applies to Plaintiff's "widespread practice" failure to train claim. *See, e.g.*, *Daniel*, 833 F.3d at 733−36. The Seventh Circuit has found that "[b]oth in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

### 2.    Plaintiff's *Monell* Claim Relies Upon Disputed Facts

Too many unresolved facts remain here. For example, at the time of the handcuffing incident, Plaintiff argues that 174 security officers were untrained and working in Chicago public schools. [99] ¶ 45; [153]. A jury must determine what this exhibit actually means and whether this number—just over ten percent of all CPS security officers—constitutes a sufficient number of untrained officers to establish a true "failure to train" policy or widespread practice. *See Calhoun*, 408 F.3d at 380.

Second, both parties dispute the number of similar CPS handcuff incidents that have taken place, and thus whether the Board had sufficient notice of either a "recurring situation" or "pattern of constitutional violations" to constitute "deliberate indifference." *See Dunn*, 347 F.3d at 646. The Board acknowledges that it identified

five other school handcuffing incidents, although the parties dispute whether: (1) the officers involved were off-duty CPD officers or security officers; and (2) this distinction is even relevant. *See* [111] ¶¶ 67−75. Plaintiff asserts that the Board is aware of at least six cases in which CPS security officers or off-duty CPD security guards handcuffed students. [99] ¶¶ 69−74. In any event, a jury, rather than this Court, must determine whether these five or six incidents, together with the 174 untrained security officers, constituted constructive notice such that the Board's failure to train was "likely to result in constitutional deprivations" and thus deliberately indifferent. *See Robles*, 113 F.3d at 745.

A jury must also decide whether the Board's alleged failure to train its officers served as the "moving force" behind M.M.'s constitutional injury. *Dixon*, 819 F.3d at 348. The Board, for example, argues that Jones told Yarbrough handcuffs were prohibited. [91] ¶ 46. If this is the case, then CPS training, even with its "soft-skill" and de-escalation approach, [91] ¶ 21, may not have changed Yarbrough or other untrained officers' behavior. Alternatively, Plaintiff argues that Yarbrough had never worked in a school setting before, [91] ¶¶ 63−64, and testified that: (1) Towner told him to carry handcuffs every day; and (2) neither Jones nor Towner told him handcuffs were prohibited. [93-2] at 37, 74. Thus, a jury may find that a policy ensuring every security officer received CPS training, as well as actual CPS training, would have prevented unconstitutional handcuff use.

Based upon this evidence, this Court cannot decide, as a matter of law, whether the Board is liable for Plaintiff's Section 1983 claim under *Monell*. Thus, this Court

denies both the Board's motion for summary judgment as to Count III, [89], and Plaintiff's motion for summary judgment as to Count III, [94].

## V. Plaintiff's Motion for Sanctions Under Rule 37

Plaintiff has moved for discovery-related sanctions against the Board under Federal Rule of Civil Procedure 37 [114]. Specifically, Plaintiff argues that the Board has intentionally failed to produce, during discovery, a "strikingly similar incident" to this case in which "a security officer handcuffed two female students at a CPS school on the same day." [114] ¶ 2.

Rule 37 provides that sanctions are appropriate if a party fails to answer or object to properly served interrogatories submitted under Rule 33 or fails to respond to a properly served request for documents submitted under Rule 34. Fed. R. Civ. P. 37(d). District courts "possess wide latitude in fashioning appropriate" discovery sanctions. *Johnson v. Kakvand*, 192 F.3d 656, 661 (7th Cir. 1999). Discovery "sanctions may only be imposed where a party displays willfulness, bad faith, or fault." *Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 1997).

On December 5, 2016, Plaintiff's counsel propounded the following discovery request upon the Board:

> 13. All documents relating to any and all investigations or complaints made against a CPSBOE employee alleging that a student was placed in handcuffs in the past ten (10) years. This request includes but not limited to the complete investigative file of each incident, with all notes, findings, or disciplinary actions, recommendations, or discipline administered.

[114] ¶ 3. Plaintiff's counsel subsequently widened this request to "any and all complaints" made against "any Chicago Public School Security Officers alleging a

38

Security Officer used unreasonable, excessive, or unwarranted force or restraints against a student." *Id.* ¶ 4. Plaintiff's counsel later widened this request again to include *any* handcuffing incident performed at a CPS school by *any* individual, to which the Board agreed. *Id.* ¶¶ 5–8. But, on September 27, 2018, Plaintiff's counsel conducted an online search and discovered an incident in which a security officer handcuffed two young female students at Hyde Park Academy in 2013. *Id.* ¶¶ 10–12. The Board admits that it did not disclose this incident to Plaintiff's counsel. [129] at 2. Given that the Board's motion for summary judgment relies in part upon the fact that Plaintiff identified only "one incident involving an untrained CPS security officer," [90] at 2, Plaintiff argues that the Board intentionally withheld this information. [114] ¶ 20. Therefore, Plaintiff asks this Court to strike the Board's summary judgment motion and order the Board to pay attorney's fees and costs expended by Plaintiff in responding to the Board's summary judgment motion. [114] ¶¶ 23–24.

The Board counters that it has been forthcoming about document production in this case, providing Plaintiff with 2,785 pages of documents relating to CPS security matters. [129] at 1. Moreover, it argues that it completed two separate ESI searches involving handcuffing incidents in response to Plaintiff's specific request, which turned up 98,559 pages of documents. *Id.* According to the Board, the phrase "Hyde Park" appears 990 times, but none of those 990 references relate in any way to a handcuffing incident. *Id.* And of the twenty-six investigatory reports within those 990 references, only two relate to the security officer implicated in the 2013 Hyde

Park handcuffing incident, and neither of them involve handcuffs. *Id*. To the extent that Plaintiff argues that the incident was memorialized in a "Verify Report" completed by Hyde Park's Dean of Behavior, [114] ¶ 11, the Board counters that the report does not "contain the word handcuff." [129] at 2. According to the Board, it simply had no document regarding the 2013 Hyde Park handcuffing incident in its possession. *Id*.

This Court finds that the Board's behavior does not rise to the requisite "willfulness, bad faith, or fault" to warrant discovery sanctions. *Langley*, 107 F.3d at 514. Given the nature and extent of the Board's discovery production, and its representations that it acted in good faith when it conducted its ESI searches, this Court cannot conclude that the omission of the 2013 handcuffing incident warrants the extraordinary sanction of striking the Board's summary judgment motion, or awarding attorney's fees and costs. And because this Court has denied the Board's motion for summary judgment as to the *Monell* claim, the Board's reliance upon Plaintiff identifying only "one incident involving an untrained CPS security officer," [90] at 2, is moot.

Therefore, Plaintiff's motion for sanctions under Rule 37 [114] is denied.

## VI.   Conclusion

This Court grants in part and denies in part Yarbrough's motion for summary judgment [87]; denies the Board's motion for summary judgment [89]; grants in part and denies in part Plaintiff's cross-motion for partial summary judgment against Yarbrough and the Board [94]; and denies Plaintiff's motion for discovery-related sanctions against the Board [114].  All dates and deadlines stand.

Dated:  November 26, 2018

Entered:

John Robert Blakey
United States District Judge